IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:14–HC–02255-M

UNITED STATES OF AMERICA,

    Petitioner,

v.

AIRICK RHAEMON BROWN,

    Respondent.

ORDER

This matter comes before the court on Petitioner's Motion for Revocation of Conditional Release pursuant to 18 U.S.C. § 4246(f) [DE 34]. Respondent opposes the motion. The court heard the matter on October 28, 2025. For the reasons that follow, the motion is granted.

Respondent Airick Brown was initially committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4246 on May 7, 2015. Following improvement in Respondent's mental status, Petitioner United States filed a certificate of improved mental condition and request for conditional release, and Respondent was conditionally released on July 26, 2019. To be permitted to remain on conditional release in the community after a civil commitment, a respondent must have recovered from his mental disease or defect to such extent that his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another. *See* 18 U.S.C. § 4246(e).

Section 4246(f) governs requests for revocation of a respondent's conditional release from civil commitment. Under that section, a district court shall remand a conditionally released person to a suitable facility if it finds that (1) the person has "fail[ed] to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment;" and (2) in light of the

person's failure, "his continued release would create a substantial risk of bodily injury to another person or serious damage to property of another." *United States v. Taylor*, 311 F. App'x 678, 679 (4th Cir. 2009) (citing 18 U.S.C. § 4246(f)); *see also United States v. Taylor*, 776 F. App'x 155, 157 (4th Cir. 2019) (a district court must make both findings to revoke conditional release). A preponderance of the evidence standard applies to both elements. *United States v. Perkins*, 67 F.4th 583, 615, 637 (4th Cir. 2023).

For the first element, the government must sufficiently develop evidence of the alleged violation(s) in the record. *See id.* at 637–38. As to the second element—the dangerousness inquiry—a "rigid" factoring test is not required. The Fourth Circuit found that relying on any set of factors is "impracticable" because "concepts of dangerousness" are "increasingly complex, multifaceted, and continually evolving." *Id.* at 616, 634. Instead, the court's dangerousness inquiry must have "sufficient play in the joints." *Id.* at 634.

Notably, the burden is on the government—not the district court—to "develop the factors, statistical risk predictors, or other factual parameters bearing on the individualized inquiry." *Id.* If the government does not meet this burden, then the court must "direct them to drill down and perform their due diligence." *Id.* The Fourt Circuit cautions courts against "simply adopting a facility director's recommendation." *Id.* at 636.

In this case, Petitioner alleges that Respondent violated the following conditions of his release:

- Condition #3 (*requiring residence with mother*): due to concerns regarding Respondent's increasingly hostile and erratic behavior toward her, Respondent's mother requests that she be removed as Respondent's third-party custodian.

- Condition #6 (*requiring participation in a regimen of mental health care treatment, including medication*): laboratory results from drug screens in October 2023 and April 2024 reveal that Respondent may not have been taking

2

his medication as prescribed.

- Condition #12 (*requiring completion of release of information forms for mental health treatment*): "until recently," Respondent refused to complete required consent forms allowing his treatment provider to release information to probation.

- Condition #25 (*requiring notice to probation if contact with law enforcement*): in August 2024, Respondent's mother notified probation that Respondent had been stopped by police while driving in Tunica, MS, but he had not received a citation. When questioned, Respondent stated that his phone was inoperable due to a virus; then, when the probation officer stated he would communicate with Respondent via Respondent's mother until the phone was repaired or replaced, Respondent became hostile and refused.

Respondent denies all of the allegations, claiming that (1) he and his mother were simply not getting along, he misunderstood his probation officer's role, and he had behaved well with everyone else, including his medical provider and therapist; (2) the drug screens and Respondent's subsequent compliance show that Respondent's medication needed to be adjusted, not that he was refusing to take it; (3) Respondent agreed to sign release forms required by his medical providers and believed those required by probation were duplicative and unnecessary; and (4) Respondent told his probation officer that he had not reported the traffic stop because his phone "had a virus."

Based on the testimony provided by Probation Officer Specialist Brandon McTeer and the letter written by Respondent's mother, Linda Brown, the court finds by a preponderance of the evidence that Respondent violated Condition #3 by behaving in an aggressive and hostile manner toward Ms. Brown, his third-party custodian, which caused her to seek removal of her role as Respondent's custodian. In seeking custodial removal, Ms. Brown states, "I do not feel safe in my own home anymore because of the constant ang[ry] outbursts" by Respondent and "[h]e has shown animosity and threatening behavior toward his probation officers which outpours to me afterwards because I do not agree with his conduct." DE 34-1. Additionally, Officer McTeer testified that he observed Respondent raise his voice and make angry demands, such as "shut up!" at Ms. Brown

3

on several occasions, and the officer spoke directly with Ms. Brown on one occasion by telephone when Ms. Brown hid in her bathroom and expressed her fear of Respondent by whispering so that Respondent would not know she was speaking with Officer McTeer.

The court also finds by a preponderance of the evidence that Respondent violated Condition #6 by failing to take his medication, as demonstrated by drug screen results in October 2023 and April 2024, which reflected no trace of aripiprazole (or, "Abilify") in his system. Officer McTeer testified that Respondent's psychiatrist, Diana Mims, reviewed these test results. Dr. Mims also informed Officer McTeer that results from a test in September 2024, after which McTeer had raised concerns regarding Respondent's "sudden change" in behavior, reflected a low amount of aripiprazole in Respondent's system. Dr. Mims interpreted the September 2024 results as reflecting the possibility that Respondent had been tapering off his medication or had recently started taking the medication again.

Furthermore, the court finds by a preponderance of the evidence that Respondent violated Condition #12 by refusing to sign required forms reflecting his release of medical information to the probation office. While Respondent formally denied this allegation, the unrebutted evidence reflects that Officer McTeer and his supervisor, Officer Middleton, repeatedly directed Respondent to sign the required forms but he refused to do so. Although there is some indication in the record of Respondent's claim that he can no longer write after a 2024 automobile accident, probation did not require that his signature be precise, and Respondent does not deny that he signed at least one release form provided to him by his treatment provider at Life Help Center in Mississippi.

Finally, the court finds by a preponderance of the evidence that Respondent failed to report to Officer McTeer (or anyone in the Mississippi probation office) that he was stopped by police while driving in Tunica, Mississippi. Even taking Respondent's claim that his phone was

4

inoperable during the time at and after the traffic stop, Respondent could have reported the contact with police to Officer McTeer through his custodian, Ms. Brown, but he did not.

Having found that Respondent violated all of the conditions, as alleged by Petitioner, the court must proceed to determine whether, in light of these violations, Respondent's "continued release would create a substantial risk of bodily injury to another person or serious damage to property of another." *Perkins*, 67 F.4th at 637. Lashawn Freeman, Psy.D., Respondent's treating medical provider at FMC Butner, opines that Respondent's release at this time would create such substantial risk of harm. Dr. Freeman's report also reflects the same opinion by a risk consultation panel at FMC Butner, made up of A. Stribling Riley, Ph.D., Chief Psychologist, and M. Marks, Psy.D., Forensic Psychologist, who "opine that as a result of Mr. Brown's failure to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, his continued release to the community would pose a substantial risk of bodily injury to another person or the serious damage to the property of another." The doctors reviewed Respondent's mental health and criminal history, including charges of assault on an officer, resisting arrest, and domestic assault and threatening; Respondent also possessed a firearm while he was subject to a domestic violence restraining order. Officer McTeer described Respondent's most recent hostile behavior toward Ms. Brown, McTeer, and other probation officers as angry, argumentative, shouting, demanding, threatening (such as stepping or lunging toward officers at the probation office), and refusing to obey orders to calm down and/or leave the premises. Notably, McTeer, who had supervised Respondent for a period in 2019, then again starting in April 2024, testified that Respondent had been compliant, cooperative, and mild-mannered until August 2024, when McTeer observed Respondent's "sudden change."

McTeer also testified that, at the time he and Respondent discussed the traffic stop, Respondent mentioned the possibility that the "virus" on his phone was caused by the government, generally, or the probation office, specifically. Moreover, Respondent repeatedly questioned McTeer's authority to supervise Respondent, argued with McTeer over the meanings of some of his release conditions, and, on several occasions, expressed concern that any probation officer speak with Ms. Brown without Respondent present.

During her testimony, Dr. Freeman noted that, unlike at the time of his release in 2019, Respondent currently demonstrates little to no insight into his mental illness and need for treatment. During his recent interviews with her and the other Butner evaluators, Respondent expressed disbelief that he suffers from schizophrenia and minimized both his prior acts of violence and noncompliance with mental health treatment. During his requested allocution at the hearing before the undersigned, Respondent stated that he "told Dr. Freeman he would not admit to something he had never been diagnosed with."

Under these circumstances, the court finds Respondent's conduct in violating Conditions #3 (hostile behavior toward third-party custodian), #12 (refusal to sign release forms), and #25 (failure to report traffic stop) directly linked to his violation of Condition #6, failure to take his medication as prescribed. The evidence suggests that, without his prescribed medication, Respondent's mental illness symptoms, including paranoia and mood instability, increase. The court is particularly concerned by testimony reflecting Officer McTeer's and Ms. Brown's genuine fear that Respondent might physically harm them. Notably, Dr. Freeman and the other evaluators have reported Respondent's compliance with psychotropic medication since his arrival at FMC Butner and his attendant "symptom improvement compared to when he was in the community" (DE 39 at 14). Respondent's compliance while in custody (and during his period of release from

6

2019 to August 2024) appears to demonstrate the effectiveness of proper treatment for his mental illness.

Thus, in light of Respondent's failure to comply with prescribed treatment and his increased mental illness symptoms, as demonstrated by Respondent's hostile behavior toward his mother and probation officers, refusal to acknowledge McTeer's authority and sign release forms, and belief that his phone was infected by probation (or "the government") with a virus, Respondent's continued release would create a substantial risk of bodily injury to another person or serious damage to another's property.

As stated at the hearing, this was a close call, particularly because Respondent has, in the recent past, demonstrated his ability to comply with treatment and successfully live in the community. The court noted Respondent's "stressful" living arrangement with his mother, which appears to have contributed to his decompensation. However, with proper treatment compliance and increased insight into his mental illness and need for treatment, Respondent can be restored to improved mental health and the ability to seek release on conditions once again. The court finds that, until his condition has improved (which, by all accounts, may be sooner rather than later), Respondent's release must be revoked pursuant to 18 U.S.C. § 4246(f) and he must be remanded to FMC Butner or another suitable facility for commitment and treatment.

Petitioner's Motion for Revocation of Conditional Release [DE 34] is GRANTED. It is ORDERED AND ADJUDGED that Respondent's conditional release heretofore granted is revoked, and Respondent is remanded to the custody of the Attorney General pursuant to 18 U.S.C. § 4246.

7

The United States shall file forensic update reports on an annual basis beginning November 1, 2026.

SO ORDERED this 30Th day of October, 2025.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE